470 P.2d 246

**The STATE of Utah, Plaintiff and Respondent,**

v.

**Edward Harold SCHAD, Jr., Defendant and Appellant.**

**No. 11588.**

Supreme Court of Utah.
May 21, 1970.

---

1. Walker Bank & Trust Company v. Brimhall, 23 Utah 2d 264, 461 P.2d 730.

---

John D. O'Connell, Jay D. Edmonds, Salt Lake City, for appellant.

Vernon B. Romney, Atty. Gen., Lauren N. Beasley, David Young, Asst. Attys. Gen., Salt Lake City, for respondent.

CROCKETT, Chief Justice.

The defendant, Edward Harold Schad, Jr., was convicted by jury of murder in the second degree for the death of Clare Odell Mortensen, occurring in connection with mutual acts of sodomy which took place at the deceased's apartment in Salt Lake City on July 4, 1968.

On appeal the defendant contends: (1) that the evidence was insufficient to justify the verdict; (2) that the trial court erred in admitting certain illegally obtained evidence; and (3) in giving a felony murder instruction relating to sodomy.

As to point (1): whether the evidence justifies the verdict, we survey the evidence and any reasonable inferences that fairly may be drawn therefrom in the light favorable to the jury's verdict. However, there are some further observations as to the manner in which that basic rule is applicable in this case. It is true, as the defendant contends, that where a conviction is based on circumstantial evidence, the evidence should be looked upon with caution, and that it must exclude every reasonable hypothesis except the guilt of defendant.[1] This is entirely logical, because if the jury believes that there is a reasonable hypothesis in the evidence consistent with the defendant's innocence, there would naturally be a reasonable doubt as to his guilt. Nevertheless, that proposition does not apply to each circumstance separately, but is a matter within the prerogative of the jury to determine from all of the facts and circumstances shown; and if therefrom they are convinced beyond a reasonable doubt of the defendant's guilt, it necessarily follows that they regarded the evidence as excluding every other reasonable hypothesis. Unless upon our review of the evidence, and the reasonable inferences fairly to be deduced therefrom, it appears that there is no reasonable basis therein for such a conclusion, we should not overturn the verdict.[2]

The body of Clare Odell Mortensen was discovered in a closet in his apartment on

---

1. People v. Scott, 10 Utah 217, 37 P. 335; State v. Erwin, 101 Utah 365, 120 P.2d 285.

2. State v. Crawford, 59 Utah 39, 201 P. 1030; State v. Burch, 100 Utah 414, 115 P.2d 911.

July 5, 1968. His hands were tied behind his back with leather thongs and nylon cord; his ankles were also bound and two pieces of cloth were tied around his mouth and neck. Dr. James T. Weston, expert in pathology who performed the autopsy, gave his opinion that death had resulted because deceased's neck had been bound so tightly it prevented a return flow of blood from his head; and that this had been done to heighten erotic stimulus in an act of sodomy. He also found evidence of semen both in the deceased's rectum and his mouth, and fecal material on his private organs.

Most crimes, and especially of the type of crime here in question, are surrounded by the greatest possible secrecy those involved can achieve. Grave difficulties are encountered in searching out the perpetrator and in apprehending and convicting him. The main problem here is whether the various aspects of the evidence can reasonably be regarded as connecting the defendant with this murder with sufficient persuasiveness to justify reasonable minds in believing his guilt beyond a reasonable doubt.

The defendant, a soldier in the U. S. Army, was a.w.o.l. from Fort Lewis, Washington. He had left there on July 1, 1968, for the stated purpose of going to Germany. However, he came to Salt Lake City, arriving at about 5:00 a. m. July 3, and went to a cafe where he met the deceased for the first time. He went with the deceased to the latter's apartment and was in his company there and at various taverns during that day. At about midnight the deceased went into his apartment; and the defendant, with three others, left for a drive, including out to Great Salt Lake. Defendant returned to the apartment at about 6:00 a. m. Early that morning the two of them went to a tavern. The defendant says that just after noon of that day, July 4, the deceased left him at another tavern, after which he never again saw the deceased.

The time of Mortensen's death was placed by Dr. Weston as between 12:00 noon and 10:00 p. m. on July 4. In contrast to the defendant's story, the bartender at a tavern called "The Lounge" said defendant and Mortensen were there together about 2:00 p. m.; and that they left together about 4:00 p. m. The murder would have taken place that afternoon or evening. That night the defendant met a girl, one of the joy ride party of the night before, at a tavern called "The Roundup." She testified that he was observably more shaky and nervous than he was the night before, and that in reference to Mortensen: he told her that the latter had flown to Seattle. The defendant left that tavern at about 9:00 p. m. and went back to Mortensen's apartment, where he said he picked up his belongings. He told a neighbor who saw him at that time that Mortensen had

unexpectedly been called out of town. Another neighbor testified that the morning after the killing he had seen the defendant replacing a screen on a window of Mortensen's apartment, which the defendant denied. It was further shown that on the evening of July 4, (the time of the killing) the defendant moved into a motel; and that he there discarded the deceased's wallet in a trash barrel. It was also shown that the silk-like nylon cords used to tie the deceased's wrists and ankles was lace from combat boots. The manager of the motel observed that the defendant's combat boots were lacking in laces.

On July 5, by the deceitful use of Mortensen's credit card defendant purchased an airline ticket to Germany. He was arrested by military authorities there on July 8. At the request of the American military authorities his two suitcases were seized and sent to Fort Douglas, Utah, where the Salt Lake City police were allowed to examine them, and they found a coat which had belonged to Mortensen.

Upon the basis of the evidence and the inferences that reasonably could be drawn therefrom, particularly because in those respects where the defendant's story could be checked against other credible evidence not affected with self-interest, his story did not jibe with other facts shown, we are unable to say that reasonable minds could not have believed beyond a reasonable doubt that the defendant committed the crime.

Defendant's second contention: that there was prejudicial error in admitting evidence taken from his suitcases, relates to two items: a coat which had belonged to the deceased, and the defendant's name tags. We set aside for the moment the question as to whether they were obtained by an unreasonable search, to consider whether in any event there may have been prejudicial error. We first note that there was actually no valid objection made to the receiving of those items in evidence. With respect to the coat this occurred:

DISTRICT ATTORNEY: I offer into evidence Exhibit No. 27.

DEFENSE COUNSEL: No objection.

THE COURT: The exhibit will be admitted.

DEFENSE COUNSEL: Subject to the objection that has been prior stated to the court.

The objection "prior stated" referred to a general statement made on a previous day about the suitcases. The statement of counsel would not constitute a proper and specific objection to the introduction of the evidence as is required, especially so because it was made after the discussion of and the actual admission of the evidence. However, we recognize that if it appears that the interests of justice so require, this court may review claimed errors even in

the absence of a proper objection.[3] Consistent therewith it is deemed appropriate to make these further observations: The probative value of the name tags was nil because the suitcases had been sent from Germany as belonging to the defendant, about which fact there was no question. Insofar as the coat is concerned, it could only show that the defendant had had some prior association with the deceased in Salt Lake City, a fact which was likewise not in dispute. The defendant freely so admitted in his own testimony and explained that: Because he was going to Germany where it was cold, the deceased had offered him the coat, which he had accepted. The deceased being gone, there could be no other explanation. We, therefore, do not see how the coat, in and of itself, could have had any significant probative value one way or another as to the defendant's guilt or innocence, nor how the rulings on this evidence could be regarded as reversible error.[4]

█ In regard to the defendant's third contention: that the giving of a felony murder instruction was error, it is to be noted that under our statute defining mur-

der, there is a distinction to be made between first-degree murder resulting from felony, and murder which may be found to be second-degree murder, where felony may be involved. Section 76–30–3, U.C.A. 1953, provides:

> Degrees of murder.—Every murder perpetrated by poison, lying in wait or any other kind of wilful, deliberate, malicious and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than the one who is killed; or perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life;—is murder in the first degree. Any other homicide committed under such circumstances as would have constituted murder at common law is murder in the second degree.

Defendant seems to essay the position that because the killing was not in the commission of one of the named felonies involving violence: arson, rape, burglary or

---

3. State v. Cobo, 99 Utah 89, 69 P.2d 952 (1936).

4. This comes within the rule that if it appears beyond a reasonable doubt that error would have had no effect upon the outcome of a trial, it should not be regarded as reversible. See Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726,

23 L.Ed.2d 284; see statement in State v. Scandrett, 24 Utah 2d 202, 468 P.2d 639 (April, 1970); Sec. 77–42–1, U.C.A.1953, which requires errors not affecting essential rights to be disregarded; and cf. Fed. Rules Crim.Proc., Rule 52(a), 18 U.S. C.A.

robbery, there should have been no instruction on felony murder. This position is not tenable because it ignores the subsequent portions of our statute. It is not to be doubted that murder must come within the definition set forth therein. But that also provides for "any other homicide committed under circumstances which would have constituted murder at common law." This included death resulting from the perpetration of any felony.[5] We agree with the reasoning of the cases cited by the defendant that in order for death to constitute murder because it results in the commission of a felony, the felony must be one which may cause death because it may be dangerous to human life.[6] This reasoning correlates with the part of our statute making it murder if a death results from "any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life." However, we fail to see how that affords any comfort or protection to the defendant in this case. In listing certain felonies which are dangerous to the lives of others, it certainly was not intended to exclude other felonies which might be so; and this must be determined from the circumstances of the particular crime.

It is so obvious as not to require elucidation that the act of sodomy committed in the manner shown here, with the deceased so bound that he choked to death, was an act "greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life." The trial court did not submit a first-degree murder verdict. But under the circumstances shown, the giving of the instruction on felony murder in the second degree, and the verdict of guilty rendered thereon, were amply justified.

Affirmed. No costs awarded.

TUCKETT and ELLETT, JJ., concur.

CALLISTER and HENRIOD, JJ., concur in the result.

5. 1 Wharton, Criminal Law, Sec. 251, p. 539.

6. See People v. Phillips, 64 Cal.2d 574, 51 Cal.Rptr. 225, 414 P.2d 353; State v. Moffitt, 199 Kan. 514, 431 P.2d 879; and Jenkins v. State, 230 A.2d 262 (Delaware 1967).