788 P.2d 1162

**STATE of Arizona, Appellee,**

v.

**Edward Harold SCHAD, Jr., Appellant.**

No. 4876–3.

Supreme Court of Arizona,
En Banc.

Dec. 14, 1989.

Robert K. Corbin, Atty. Gen. by Jessica Funkhouser, Chief Counsel, Crim. Div., and R. Wayne Ford, Asst. Atty. Gen., Phoenix, for appellee.

S. Alan Cook, P.C. by S. Alan Cook, Phoenix, for appellant.

WILLIAM F. HOLOHAN, Justice (Retired).

The defendant, Edward Harold Schad, Jr., was convicted by a Yavapai County jury of first degree murder and sentenced to death. *State v. Schad*, 129 Ariz. 557, 633 P.2d 366 (1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982). On the defendant's petition for post-conviction relief, this court reversed the conviction, holding that the trial court committed fundamental error by instructing the jury on felony murder without defining the elements of the underlying felony. *State v. Schad*, 142 Ariz. 619, 691 P.2d 710 (1984). On remand, the defendant was again convicted of first degree murder and sentenced to death. This appeal followed. We have jurisdiction pursuant to A.R.S. § 13–4031.

The facts of this case are fully set forth in our 1981 opinion, *supra*. Briefly summarized, the following facts led to the defendant's conviction in the second trial.

The victim, Lorimer "Leroy" Grove, was last seen alive on August 1, 1978, when he left Bisbee, Arizona for Everett, Washington in his new Cadillac. His body was discovered August 9, 1978, off the highway just south of Prescott. The corpse was not identified until October 11, 1978, after the defendant's arrest. The killer had strangled the victim to death with a small rope tied around his neck.

The defendant's connection with the homicide is established only by circumstantial evidence. Beginning with the day after the victim left Bisbee, the defendant made numerous purchases with the victim's credit cards. The police recovered credit cards from the defendant's wallet after his arrest. The state also introduced a forged check drawn on the victim's bank account and made to the defendant's order for "wages." A car the defendant had rented, but never returned, was discovered in Flagstaff in early August, 1978. Discovered in this car was a "unique mirror contraption" designed and built by the victim. On September 3, 1978, New York authorities issued the defendant a speeding ticket for an offense he committed while driving the victim's Cadillac. The defendant explained to the citing officer that the car belonged to his friend Leroy Grove. Later in September, the defendant drove the Cadillac to Salt Lake City, Utah. While he was in Utah, the Salt Lake City police arrested the defendant for investigation of a possible parole violation and possession of a stolen vehicle. During his incarceration in the Salt Lake City jail, the defendant spoke with John Duncan [1] and made several inculpatory statements. Thereafter, a Yavapai County Grand Jury indicted the defendant for the murder of Lorimer Grove and the authorities extradited the defendant to Arizona to stand trial.

The defendant raises the following issues for our consideration:

    1. Did admitting statements that the defendant made to John Duncan in the

---

**1.** Duncan had been staying with the defendant's girlfriend when the defendant arrived in Salt Lake City.

Salt Lake City jail violate the defendant's constitutional rights?

2. Was the defendant denied a fair trial when the state failed to preserve the victim's clothing and preserve fingerprint impressions on items found with the body and on the mirror contraption?

3. Did the trial court commit error by failing to instruct the jury on, and provide a form of verdict for, the lesser-included offense of robbery?

4. Did the trial court err when it refused to give forms of verdict for both premeditated murder and felony murder?

5. Was it proper to use the defendant's prior murder conviction as an aggravating factor?

6. Were the defendant's double jeopardy rights violated when two aggravating factors were found based on a single prior conviction?

7. Were the defendant's rights violated when the trial court found that the the defendant committed the murder for pecuniary gain?

8. Did the court fail to properly weigh the mitigating circumstances?

9. Did the defendant's "inability" to "voir dire" the trial judge deprive him of a fair trial?

10. Is Arizona's statutory death sentencing scheme unconstitutional?

In addition to addressing the issues raised by the defendant, we independently review the aggravating and mitigating circumstances found by the trial judge, determine whether the defendant's sentence is proportional to similar cases, and search the record for fundamental error.

## THE STATEMENTS

At the defendant's second trial, as in the first trial, the court permitted the state to present testimony by John Duncan concerning statements the defendant made to him when he visited the defendant in the Salt Lake City jail. The defendant's most incriminating statement was that he would "deny being in any area of Arizona or the State of Arizona, particularly Tempe, Arizona and Prescott, Arizona."

This court reviewed the circumstances surrounding Duncan's testimony in our 1981 opinion in light of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). *Schad*, 129 Ariz. at 565, 633 P.2d at 374. We found that Duncan and the Utah authorities had no agency relationship, that the police did not actively or deliberately solicit Duncan's assistance and that the evidence obtained was insignificant. Therefore, we concluded that the trial court properly denied the defendant's motion to suppress the statement. *Schad*, 129 Ariz. at 566, 633 P.2d at 375. Nevertheless, the defendant's counsel again moved to suppress the statements prior to the second trial because new evidence allegedly justified a rehearing and established grounds for suppressing the testimony at the new trial. This new evidence consisted of:

1. Testimony from Sergeant Judd of the Coconino County Sheriff's office that Detective Halterman described Duncan as an "informant" and a "confidential informant."

2. Testimony that Detective Halterman had asked Duncan if he would be willing to visit the defendant in jail and arranged the visit for a Monday. Monday was not a normal visiting day, so Duncan could not have made the visit without special arrangements.

3. Detective Halterman arranged for Duncan's release pending extradition.

Despite this "new evidence," the trial court again denied the defendant's motion to suppress. The judge concluded that the use of the word "informant" by Detective Halterman was a matter of semantics rather than of substance. In his ruling the judge stated:

The Halterman testimony was rather clear, was extremely clear and unequivocal relative to the witness Duncan's not being, term of art, a confidential informant. The way we come up with the language confidential information and informant in this particular case is from Lieutenant Judd from his police report ... but of course as you know, Lieuten-

ant Judd had no facts upon which to base a conclusion that ... Mr. Duncan might be what we have come to know as the confidential informant.

R.T. Vol. VI, p. 815.

Halterman denied suggesting a visit with the defendant. In fact, Duncan testified it was his idea. R.T. Vol. VI, pp. 672 and 809. The record is less clear on who arranged the visit. Duncan stated that he thought that Detective Halterman or someone from the police department arranged his visit. *Id.* at 804. Nevertheless, the evidence established that the police did not tell Duncan to visit Schad or what questions he should ask. Furthermore, the homicide investigation had yet to focus on Schad because Detective Halterman did not learn that the owner of the Cadillac was dead until a month *after* Duncan's visit. *Id.* at 666, 803. Finally, Duncan's release pending extradition was arranged prior to the Schad case coming to light for reasons separate and apart from Duncan's subsequent assistance in this case.

It is unnecessary to review the relevant case law. We do not find the defendant's evidence any more compelling than the last time. The record supports the judge's ruling. We find no error in denying the defendant's motion to suppress.

## PRESERVATION OF EVIDENCE

The state did not (1) preserve the victim's clothing; (2) fingerprint items found with the body; or (3) fingerprint the mirror device found in the defendant's abandoned rental car. The trial court did give a *Willits* instruction.[2] *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964). Despite this instruction, the defendant argues that the state's failure to process these items, especially the mirror, deprived the defendant of exculpatory evidence in violation of his due process right to a fair trial. The defendant contends that had these items been pro-

cessed, he could have proved that someone else committed the crime.

The state counters that the defendant is barred from relief because he failed to raise this issue at the first trial. The only case cited by the state is inapposite because it concerns waiver of issues by failure to object at trial. Although the defendant did not raise this issue until the second trial, we find that his pretrial motions properly preserved this issue for review.

The "substantive" issue raised is whether the state had a duty to preserve the victim's clothing,[3] and to collect and process fingerprints from the mirror and other objects. The defendant argues that the state's failure to collect *and preserve* potentially exculpatory evidence requires reversal of the conviction and dismissal of the charges. *See California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *State v. Mitchell,* 140 Ariz. 551, 683 P.2d 750 (App.1984).

In *Trombetta,* the U.S. Supreme Court held that the due process clause of the 14th Amendment does not require the state to preserve breath samples in order to introduce the results of breath-analysis tests at a DUI trial. 467 U.S. at 491, 104 S.Ct. at 2535, 81 L.Ed.2d at 423. Under the Federal Constitution, the state's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488, 104 S.Ct. at 2534, 81 L.Ed.2d at 422. This materiality test requires that the evidence (1) possess an exculpatory value that was apparent before the evidence was destroyed and (2) be such that the defendant would be unable to obtain comparable evidence by other reasonable means. *Id.* at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422. The Court concluded that "the chances are extremely low

---

2. The jury was instructed:
   If you find that the plaintiff, the State of Arizona, has destroyed, caused to be destroyed or allowed to be destroyed any evidence whose contents or quality is in issue, you may infer that the true fact is against their interest.

3. It should be noted that the state's expert testified that the victim's clothes were forensically useless due to the advanced state of decomposition.

that preserved [breath] samples would have been exculpatory." *Id.*

Recently, we held that a *Willits* instruction adequately protects a defendant's due process rights where the state has destroyed or failed to preserve evidence unless the defendant is prejudiced or the state acted in bad faith. *State v. Tucker*, 157 Ariz. 433, 442–43, 759 P.2d 579, 588–89 (1988). *Tucker* held that the partial latent fingerprints destroyed by the state "had some forensic value in excluding the defendant from having left the prints," but "could not have excluded Tucker from having handled the gun, and certainly could not have excluded him from committing the crime." *Id.* at 442, 759 P.2d at 588. Thus, we concluded that a *Willits* instruction adequately protected the defendant's rights. *Cf. State v. Hannah*, 120 Ariz. 1, 583 P.2d 888 (1978) (where the only items connecting the defendant to the crime were destroyed, we found that the defendant had been so seriously prejudiced by the loss of the evidence that he could not receive a fair trial).

■ The state concedes that any recoverable fingerprints which may have existed were probably destroyed in the defendant's first trial. The state urges us to consider that the defendant had ample opportunity to analyze the mirror before the prints were destroyed and that defense counsel participated in their destruction. It may well be that the defendant's counsel participated in the destruction of evidence. However, the duty to preserve evidence remains with the state and nothing in the record shows the defendant or his counsel solely responsible or more culpable than the state for the loss.

■ Nevertheless, we find that the *Willits* instruction adequately protected the defendant's rights. Unlike *Hannah*, the mirror was not the only piece of evidence linking the defendant with the crime. The defendant was arrested in possession of the victim's credit cards and car. He told the New York patrolman that he was driving the car for the victim. Furthermore, as we found in *Tucker*, a *Willits* instruction adequately addressed the loss of the fingerprint evidence.

The best possible scenario for Tucker is that an examination of the partial latent prints would have excluded him from the set of persons whose prints were on the gun. However, as stated above, such an exclusion would not have excluded Tucker from ever having handled the gun and certainly would not exonerate Tucker of the alleged crime. As Tucker's expert explained, Tucker could have touched the gun, but not left a print, or the print could have been easily wiped off either intentionally or unintentionally through subsequent handling. We find no reasonable possibility that defendant was prejudiced by the destruction of the partial latent prints. [Citations omitted.]

Moreover, under the *Willits* instruction, the jury could infer exactly what the destroyed evidence, at best, could have proved—that Tucker's prints were not on the gun. Under these circumstances, where the destroyed evidence would not exonerate Tucker, and where the *Willits* instruction provided the same benefit as any independent examination of the evidence, the *Willits* instruction protected Tucker's right to a fair trial.

*Tucker*, 157 Ariz. at 443, 759 P.2d at 589.

Similarly, in the present case, the best that the defendant could hope for is that none of his fingerprints were on the mirror, clothing or other items. While this would have excluded the defendant from the set of persons whose prints were on these items, it would not have excluded the defendant from ever having handled any of these objects, nor would it have exonerated him of the alleged crime. The *Willits* instruction accomplished the most that the defendant could have proved—that his prints were not on these items. We find that the defendant's rights were adequately protected.

### FAILURE TO GIVE ROBBERY INSTRUCTION OR FORM OF VERDICT

Here the defendant contests the trial court's failure to give a lesser included offense instruction or to provide a form of

verdict for robbery. Defendant argues that *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), requires a robbery instruction and form of verdict because: (1) the evidence supported a conviction for the offense of robbery; and (2) the robbery is a lesser-included offense of the felony murder because it was the underlying felony.

■ Although the defendant concedes that he did not request such an instruction or verdict form, he argues that it was fundamental error. He also maintains that counsel ineffectively assisted him in failing to request such instructions. In an Arizona capital case, the trial court must instruct on all lesser-included offenses supported by the evidence. Failure to do so, with or without a request, constitutes fundamental error. *State v. Whittle*, 156 Ariz. 405, 407, 752 P.2d 494, 496 (1988). However, in Arizona there is no lesser-included offense to felony murder. *State v. LaGrand*, 153 Ariz. 21, 30, 734 P.2d 563, 572, *cert. denied*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987); *see also State v. Leslie*, 147 Ariz. 38, 48, 708 P.2d 719, 729 (1985); *State v. Martinez–Villareal*, 145 Ariz. 441, 446–47, 702 P.2d 670, 675–76, *cert. denied*, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985). Although we agree with the defendant that the evidence supported an instruction and conviction for robbery, we disagree that the underlying felony supporting a felony murder conviction requires a lesser-included offense instruction and form of verdict. *LaGrand*, 153 Ariz. at 30, 734 P.2d at 572. His attorney's failure to request one was not ineffective assistance of counsel.

## SINGLE VERDICT FORM FOR FIRST DEGREE MURDER

■ The defendant next argues that the trial court erred when it submitted to the jury one verdict form for the crime of first-degree murder while instructing them that the crime could be committed in either of two ways—by premeditation or by the commission of a felony. The defendant's arguments on this issue have all been previously decided by this Court and rejected.

In *State v. Encinas*, 132 Ariz. 493, 647 P.2d 624 (1982), we stated:

> In Arizona, first degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder. *See State v. Axley*, 132 Ariz. 383, 646 P.2d 268 (1982). Although a defendant is entitled to a unanimous jury verdict on whether the criminal act charged has been committed, *State v. Counterman*, 8 Ariz.App. 526, 448 P.2d 96 (1968), the defendant is not entitled to a unanimous verdict on the precise manner in which the act was committed.

*Id.* at 496, 647 P.2d at 627.

Our decision in *State v. Smith*, 160 Ariz. 507, 774 P.2d 811 (1989), did not change the substantive rule that it was not error to have one form of verdict for first degree murder even though both premeditation and felony murder were being submitted to the jury. *Smith* does, however, strongly urge that alternate forms of verdict be submitted to a jury when a case is submitted on alternative theories of premeditated and felony murder. *Id.* at 507, 774 P.2d at 811.

## SENTENCE

In the special verdict on the sentence, the trial court found the existence of three statutory aggravating circumstances: previous conviction of an offense for which a sentence of life imprisonment was possible, previous conviction for a crime involving violence, and commission of the murder for pecuniary gain. The trial court found several mitigating factors, but concluded that they were not sufficiently substantial to call for leniency. The trial court specifically found that the total mitigation was not sufficient to overcome any one of the aggravating circumstances. R.T. August 29, 1985, p. 10. As a result of the court's findings, the defendant was sentenced to death.

## THE PRIOR CONVICTION

The defendant's 1968 conviction in the State of Utah for second degree murder was found by the trial court to constitute

two aggravating circumstances set out in *former* A.R.S. § 13–454(E)(1) and (E)(2) (now A.R.S. § 13–703(F)(1) and (F)(2)).[4] The defendant attacks the trial court's use of these factors to enhance the penalty to death because: (1) society no longer recognizes sodomy as a felony; (2) there is no crime of felony second-degree murder in Arizona; (3) the present Arizona sodomy statute is unconstitutional; (4) former § 13–454(E)(2) (now § 13–703(F)(2)) is not applicable because the Utah offense did not involve violence; and, (5) the Utah conviction is invalid in light of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

The defendant's conviction of second degree murder occurred in connection with mutual acts of sodomy. The victim was found in a closet with his hands and feet bound and two pieces of cloth around his neck. Apparently, the cloth was tied around the victim's neck for the purpose of restricting the flow of blood to the brain in order to heighten erotic stimulus—a practice known as auto-erotic asphyxiation. In 1968 sodomy was a felony in both Utah and Arizona.[5]

The main thrust of the defendant's argument is that the changes in the criminal code, reducing the punishment for sodomy to a misdemeanor and the elimination of the offense of second degree felony murder, require that the defendant's Utah conviction not be considered an aggravating circumstance for sentencing. The defendant's argument seeks not only to have us ignore the requirement that we consider the penalty imposable at the time of the conviction, but it mischaracterizes the nature of the defendant's Utah conviction.

■ In considering a prior offense for sentencing purposes, a court looks at the penalty in effect under Arizona law at the time the defendant was sentenced for the prior offense, not the penalty for the prior offense at the time of sentencing for a subsequent conviction. *State v. Tittle*, 147 Ariz. 339, 710 P.2d 449 (1985). The defendant concedes that pursuant to former A.R.S. §§ 13–453(B) and –1644, the maximum penalty for second-degree murder in 1968 was life imprisonment. *See State v. Williams*, 103 Ariz. 284, 440 P.2d 311 (1968). However, the defendant contends that aggravating his sentence under these circumstances would violate his constitutional rights.

Contrary to the contention implicit in defendant's argument, the prior conviction in Utah was not merely for committing sodomy. The defendant was found guilty of committing a dangerous act while engaging in sodomy. The Utah Supreme Court specifically found that sodomy performed while engaging in auto-erotic asphyxiation constituted a dangerous felony. *See State v. Schad*, 24 Utah 2d 255, 470 P.2d 246 (1970).

It is so obvious as not to require elucidation that the act of sodomy *committed in the manner shown here*, with the deceased so bound that he choked to death, was an act "greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life." *Id.* at 261, 470 P.2d at 250 (emphasis added).

The defendant's second degree murder conviction in Utah was not based on the mere act of sodomy but *the manner* in which it was performed. *Schad*, 24 Utah 2d at 261, 470 P.2d at 250. Irrespective of the debate concerning the constitutionality of statutes prohibiting consensual sodomy,[6]

---

4. The current version of the statute provides in relevant part:
    F. Aggravating circumstances to be considered shall be the following:
    1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.
    2. The defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person.

5. The current Arizona statute, in effect since 1978, provides that sodomy is a misdemeanor. A.R.S. § 13–1411.

6. Both the United States Supreme Court and this court have held that a state may lawfully prohibit consensual sodomy. *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986); *State v. Bateman*, 113 Ariz. 107, 547 P.2d 6, *cert. denied*, 429 U.S. 864, 97 S.Ct. 170, 50 L.Ed.2d 143 (1976).

it is clear that a state may lawfully punish a person for engaging in conduct exhibiting a knowing or reckless disregard for human life. *See* A.R.S. §§ 13–1103(A)(1), –1104(A)(3). This is the crux of the defendant's Utah conviction. Under similar circumstances the defendant's conduct would have constituted second degree murder in Arizona.

## CONVICTION FOR FELONY INVOLVING VIOLENCE

The defendant argues that his previous conviction for second degree murder did not involve "violence" within the meaning of A.R.S. § 13–703(F)(2). He argues that the death was an "accident" involving no physical force because he and the victim were consenting homosexual partners. To support this argument, the defendant points to the medical examiner's reports, admitted at the Utah sentencing, stating that the victim had likely tied himself up to heighten his pleasure.

The state argues that murder is inherently a violent crime, and cannot occur absent some type of violence to the victim. *Tittle*, 147 Ariz. at 345, 710 P.2d at 455 (robbery is inherently violent, and so satisfies § 13–703(F)(2)).

It is not necessary for us to resolve this issue because the trial judge, in his special findings, found that the total mitigation present was "not sufficient to overcome any one of the aggravating circumstances." Transcript of Sentencing, August 29, 1985, p. 10. Any one of the other aggravating factors would be sufficient to support the sentence.

## TWO AGGRAVATING FACTORS ARISING FROM SINGLE PRIOR CONVICTION

■ The defendant claims that the use of a single prior conviction as the basis for two aggravating factors violates his double jeopardy rights. Therefore, he argues, we should strike at least one of the aggravating factors.

So long as the trial court weighed the aggravating circumstances arising out of

the 1968 murder only once, the defendant's rights have not been infringed. *Tittle*, 147 Ariz. at 345, 710 P.2d at 455. Here the trial judge found that the totality of the mitigating circumstances was insufficient to overcome even a single aggravating factor. Hence, it did not matter that the trial court found two aggravating factors arising from his prior conviction since one was enough to impose the death penalty.

## FINDING THAT MURDER WAS COMMITTED FOR PECUNIARY GAIN

The defendant claims that the trial court violated his rights when it found that he murdered for pecuniary gain. Former A.R.S. § 13–454(E)(5) (now A.R.S. § 13–703(F)(5)). The defendant contends that the pecuniary gain aggravating factor (1) is unconstitutionally vague, (2) was unconstitutionally applied *ex post facto*, (3) violates double jeopardy, and (4) was not proved beyond a reasonable doubt.

### A. *Vagueness*

■ The defendant argues that the pecuniary gain factor is vague because it fails to distinguish between a killer for hire and a "routine" felony (e.g. burglary or robbery) where a death occurs. Therefore, a person of average intelligence will not understand that his act is a capital crime. *See State v. Bateman*, 113 Ariz. 107, 109, 547 P.2d 6, 8, *cert. denied*, 429 U.S. 864, 97 S.Ct. 170, 50 L.Ed.2d 143 (1976). We have rejected this contention in an earlier case and find no reason to hold otherwise. *State v. Nash*, 143 Ariz. 392, 400, 694 P.2d 222, 230, *cert. denied*, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985).

### B. *Ex Post Facto*

In 1980, this court held for the first time that the pecuniary gain aggravating factor was not limited to contract killers. *State v. Clark*, 126 Ariz. 428, 616 P.2d 888, *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). The defendant argues that application of *Clark* to him constitutes *ex post facto* enlargement of the penalty for murder motivated by pecuniary gain

when his offense occurred before the *Clark* decision.

■ A judicial decision is not subject to the constitutional bar against *ex post facto* legislation. *United States v. Walsh*, 770 F.2d 1490, 1492 (9th Cir.1985). However, a defendant's due process rights are violated when an unforeseeable judicial decision enlarging the scope of a criminal statute is applied retroactively to cover behavior not considered unlawful in the past. *Bouie v. City of Columbia*, 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702–03, 12 L.Ed.2d 894, 899–900 (1964).

■ In the present case, the defendant misinterprets *Clark*. That opinion did not hold that former A.R.S. § 13–454(E)(5) excluded non-contract/hired-killer situations prior to *Clark*. *Clark* merely rejected the argument that the factor of pecuniary gain was restricted to "hired guns." The *Clark* opinion did not create substantive law, it merely recognized the pre-existing scope of present law. It was not an unforeseeable enlargement nor did it suddenly make lawful conduct unlawful. As in *Clark*, finding that the defendant committed this crime for pecuniary gain is not a violation of the defendant's due process rights.

### C. *Double Jeopardy*

The defendant also claims violation of his right against double jeopardy. He reasons that use of a general verdict form prevents the court from ascertaining whether the conviction was based on a finding of premeditation or felony murder. The defendant speculates that if premeditation were the basis of the jury's conviction, then the double jeopardy clause would bar pecuniary gain as an aggravating factor since the jury must have "acquitted" him of robbery. Therefore, since it is impossible to determine which type of first degree murder defendant is guilty of, but only that he is guilty of first degree murder, the state failed to prove pecuniary gain beyond a reasonable doubt. *State v. Richmond*, 136 Ariz. 312, 322, 666 P.2d 57, 67, *cert. denied*, 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983); A.R.S. § 13–703(C).

■ Whether the jury "acquitted" the defendant of robbery is irrelevant. The double jeopardy clause protects against a second prosecution for the same offense after acquittal or conviction, and protects against multiple punishments for the same offense. *State v. Seats*, 131 Ariz. 89, 638 P.2d 1335 (1981). Pecuniary gain is not the same offense as robbery. *See* A.R.S. § 13–1902. It is an aggravating factor for determining a defendant's sentence in a capital case. In *State v. Carriger*, 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984), *cert. denied*, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 864 (1985), we stated:

> To prove robbery, the state must show a *taking* of property from the victim, *see* A.R.S. § 13–1902(A); to prove pecuniary gain, the state must show the actor's *motivation* was the expectation of pecuniary gain, *see* A.R.S. § 13–703(F)(5). Proving a taking in a robbery does not necessarily prove the motivation for a murder, and the state cannot be said to be using one fact to prove two different items.

(Emphasis in original.) Even if we were to assume that the jury specifically found that no robbery occurred, double jeopardy does not prevent the trial judge from finding that the defendant's motivation for killing the victim was the expectation of pecuniary gain.

### D. *Sufficiency of Evidence*

■ The defendant finally contends that there was insufficient evidence to show the murder was committed for pecuniary gain. He claims that the only evidence suggesting he killed the victim for pecuniary gain was circumstantial and that the act may well have been an afterthought.

Prior to encountering the victim, the defendant was driving a stolen car. He abandoned that car and took the victim's car. He also left the murder scene with the victim's wallet, money, credit cards and ring. This provides strong circumstantial evidence that the purpose of the murder was pecuniary gain. *Clark*, 126 Ariz. at 436, 616 P.2d at 896. The evidence strong-

ly supports the finding by the trial judge that the aggravating circumstance of pecuniary gain existed in this case.

## MITIGATING FACTORS

The defendant next argues that the trial court erred by failing to consider the defendant's potential for rehabilitation and the circumstances of the Utah murder. A.R.S. § 13–703(E) requires that the trial court "take into account the ... mitigating circumstances" and then determine whether those circumstances are "sufficiently substantial to call for leniency." Mitigating circumstances include "any factors ... which are relevant in determining whether to impose a sentence less than death...." A.R.S. § 13–703(G).

█ Contrary to the defendant's claim, the trial court did find and consider the defendant's potential for rehabilitation. Nevertheless, the trial court found this to be insufficient to overcome any of the aggravating factors. We also reject the defendant's claim that the circumstances surrounding his prior murder conviction should be considered as a mitigating circumstance because the victim experienced "a pleasurable erotic experience" before he died. While it is clear that the Utah murder did not display the depravity present in the case at bar, the trial court did not find the circumstances of the earlier murder to be mitigating and neither do we.

As is required at this point, we conduct our own independent examination of the record to determine whether the death penalty is properly imposed. *State v. Vickers,* 129 Ariz. 506, 516, 633 P.2d 315, 325 (1981). We note, however, that in 1981 we considered and affirmed the defendant's death penalty. *State v. Schad,* 129 Ariz. 557, 633 P.2d 366 (1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982).

█ Our review of the record satisfies us that the state proved that the defendant committed the murder for pecuniary gain. The state also properly established an additional aggravating circumstance arising

out of the defendant's prior murder conviction. Thus, we find, without question, that there were at least two aggravating circumstances in the present case.

We also conclude that the mitigating circumstances are insufficient to outweigh a single aggravating factor. Although the defendant has continued to show exemplary behavior while incarcerated, we do not find this to be sufficiently substantial to call for leniency. The evidence shows that the defendant strangled to death a 74-year-old man in order to obtain his vehicle and money. At the time the defendant committed this act, he had previously been found criminally responsible for another person's death. The death penalty is appropriate in this case.

## VOIR DIRE EXAMINATION OF TRIAL JUDGE

█ The defendant next contends that lack of an opportunity to examine the trial/sentencing judge for bias and/or prejudice in a capital case violated his rights to due process and a fair trial. The defendant argues that *voir dire* examination of potential jurors is a constitutional requirement of a fair trial and should similarly apply in a capital sentencing case where the trial judge sits as a fact-finder.

We recently addressed this issue in *State v. Fulminante,* 161 Ariz. 237, 778 P.2d 602 (1988), *reconsideration granted on other grounds,* (July 11, 1989), and rejected the defendant's claim that he had a constitutional right to voir dire the trial judge. We have also previously held that a defendant must raise this issue at trial or it will be waived. *State v. Rossi,* 146 Ariz. 359, 369, 706 P.2d 371, 381 (1985). Here the the defendant failed to request *voir dire* of the trial court, and never expressly or impliedly alleged bias or prejudice. Therefore, he waived this issue.

## CONSTITUTIONAL CHALLENGES [7]

█ The defendant raises several arguments that the Arizona death penalty is

---

7. We are aware of the decision of the United States Court of Appeals for the Ninth Circuit in

*Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir. 1988), *petition for cert. filed,* Mar. 20, 1989,

unconstitutional. The defendant first argues that the statutory scheme for capital punishment is unconstitutionally vague because it fails to provide adequate standards for weighing aggravating and mitigating standards. We have previously considered this argument, and we reject it again. *Rossi*, 146 Ariz. at 366, 706 P.2d at 378. The defendant next contends that Arizona's death penalty statute is mandatory and therefore unconstitutional. As we have done before, we reject this argument. *Id.* Finally, the defendant asks us to reconsider the Arizona death penalty on the following five grounds: (1) the death penalty is cruel and unusual punishment; (2) it denies the defendant a right to a jury trial on the issue of sentencing; (3) it allows the prosecutor arbitrary discretion to seek the death penalty; (4) it places the burden of proving mitigating circumstances on the defendant; (5) it is arbitrarily, capriciously and freakishly imposed. There is nothing in the defendant's case causing us to reconsider the death penalty on any of these grounds. We have rejected them before and adhere to that view. *Id.*

## PROPORTIONALITY REVIEW

■ After considering the defendant's claims of error, we make an independent review to determine whether the death penalty is excessive or disproportionate to the penalty imposed in similar cases. *Richmond*, 136 Ariz. at 321, 666 P.2d at 66. We compare the defendant and his crime to those cases where the death penalty was properly imposed because the crime was committed in a manner raising it above "the norm" of first degree murders, or the defendant's background places him above "the norm" of first degree murderers. *State v. Blazak*, 131 Ariz. 598, 604, 643 P.2d 694, 700, *cert. denied*, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982). We also compare the defendant and his crime to those cases where we have lessened the

penalty imposed to life imprisonment. *State v. McCall*, 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983), *cert. denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984).

There are numerous instances where we have upheld the imposition of the death penalty when the murder was committed for pecuniary gain. *State v. LaGrand*, 152 Ariz. 483, 733 P.2d 1066, *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987); *State v. Harding*, 141 Ariz. 492, 687 P.2d 1247 (1984); *State v. Blazak*, 131 Ariz. 598, 643 P.2d 694, *cert. denied*, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982); *State v. Tison*, 129 Ariz. 526, 633 P.2d 335 (1981), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). We have also upheld the death penalty in cases where the defendant had prior convictions punishable by life imprisonment. *State v. Arnett*, 158 Ariz. 15, 760 P.2d 1064 (1988); *State v. Castaneda*, 150 Ariz. 382, 724 P.2d 1 (1986); *State v. Bracy*, 145 Ariz. 520, 703 P.2d 464 (1985), *cert. denied*, 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986); *State v. Harding*, 141 Ariz. 492, 687 P.2d 1247 (1984).

In contrast, we have reduced a defendant's death penalty sentence to life imprisonment where we have found insufficient evidence to support the aggravating circumstances. *State v. Johnson*, 147 Ariz. 395, 710 P.2d 1050 (1985). We have also reduced the defendant's sentence where the defendant was mentally impaired, *State v. Graham*, 135 Ariz. 209, 660 P.2d 460 (1983), or very young when he committed the crime. *State v. Valencia*, 132 Ariz. 248, 645 P.2d 239 (1982).

Nothing in the present case leads us to consider that death is a disproportionate punishment. The defendant does not fall within any of the cases where we have reduced the death penalty to life imprisonment. We find nothing in the record otherwise making his sentence disproportionate. The defendant does, however, fall within

---

which holds that Arizona's death penalty statute is unconstitutional. The Ninth Circuit opinion invalidates our death penalty scheme on some of the same grounds the defendant raises here. We note that the grounds on which the Ninth Circuit rested its constitutional holdings are

grounds on which different courts may reasonably hold differing views of what the Constitution requires. Until the United States Supreme Court instructs us that our interpretations are incorrect, we will continue to apply them.

those cases where the death sentence was properly imposed. Thus, the imposition of the death penalty is justified.

We have examined the record for fundamental error and find none. We affirm the judgment of conviction and the sentence.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and MOELLER, JJ., concur.